**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 13-cv-00736-CMA

UNITED STATES OF AMERICA, *ex rel*,
DAVID H. SHEPARD, and
WILLIAM M. MARVEL, appearing *qui tam*,

      Plaintiffs/Relators,

v.

GRAND JUNCTION REGIONAL AIRPORT AUTHORITY,
REX TIPPETTS, individually,
EDDIE STORER, individually,
JVIATION, INC.,
JASON VIRZI, individually, and
MORGAN EINSPAHR, individually,

      Defendants.

---

**ORDER GRANTING THE GOVERNMENT'S MOTION FOR ORDER TO APPROVE
SETTLEMENT NOTWITHSTANDING THE RELATORS' OBJECTIONS**

---

This matter is before the Court on the Government's Motion for Order to Approve

Settlement Notwithstanding Relators' Objections.  (Doc. # 32.)  For the following

reasons, the Court grants the motion and approves the settlement.

## I.      BACKGROUND

This case arises from a dispute over a fence project at the Grand Junction Airport

funded by the Federal Aviation Administration (FAA).  On March 20, 2013, David H.

Shepard and William M. Marvel (Relators), both owners of hangers at the subject

airport, filed this qui tam action on behalf of the Government alleging, as pertinent here,

that payment for the fence was the product of false claims made to the FAA by the

Grand Junction Regional Airport Authority (Airport Authority) in violation of the False

Claims Act (FCA), as amended in 1986.  As pertinent here, the FCA provides that any

person who

> knowingly presents, or causes to be presented, a false or
> fraudulent claim to the United States for payment or approval
> . . . is liable to the United States Government for a civil
> penalty.

31 U.S.C. § 3729(a)(1)(A).  "[K]nowing" and "knowingly" means that the person has

actual knowledge, acts in deliberate ignorance of the truth or falsity of the information,

or acts in reckless disregard of the truth or falsity of the information.  § 3729(b)(1).

The Office of the Inspector General for the United States Department of

Transportation, with help from the FBI and IRS, conducted a two-year investigation into

the Relators' allegations.  At first, the investigation included consideration of criminal

liability, but ultimately, the Government declined to pursue criminal charges.  In regard

to this civil proceeding, the investigation revealed that some of the Relators' claims were

actionable under the FCA, but others were not.

On March 21, 2016, the Government intervened[1], and on June 8, 2016, the

Government filed a motion requesting that this Court approve a proposed settlement

between it and the Airport Authority.  (Doc. # 32.)  The Relators object to the settlement

(Doc. # 38) and, in light of their objections, the Court held a fairness hearing on

February 16, 2017, following which this Court took the matter under advisement.

---

[1] The Government has intervened in the action only against the Airport Authority.  Relators'
claims against the remaining Defendants are unaffected by the settlement at issue here.

## II.  <u>STANDARD OF REVIEW</u>

The Court first addresses the parties' disagreement about the appropriate standard for reviewing a qui tam settlement.

Title 31, § 3730(c)(2)(B), of the United States Code provides, "The Government may settle a [qui tam] action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances."  The Tenth Circuit has not clarified what this statute means by "fair, adequate, and reasonable under all circumstances."  *Id.*

The Government argues that the Court should apply the highly deferential standard adopted in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Com.*, 151 F.3d 1139, 1145 (9th Cir. 1998).  Under *Sequoia*:

> A two-step analysis applies . . . to test the justification for dismissal: [the government must identify] (1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose. If the government satisfies the two-step test, the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal.

*Id*.  This standard, however, was set forth for review of qui tam dismissals under 31 U.S.C. § 3730(c)(2)(A), not qui tam settlements under 31 U.S.C. § 3730(c)(2)(B).  *See Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 931 (10th Cir. 2005) (adopting the *Sequoia Orange* standard for qui tam dismissals).

The Relators, on the other hand, request that this Court apply the standards governing judicial review of class action settlements under Federal Rule of Civil Procedure 23(e)(2), which, like 31 U.S.C. § 3730(c)(2)(B), requires a finding that the

3

settlement is "fair, reasonable, and adequate."  The Tenth Circuit considers the following factors when reviewing Rule 23 settlements:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002).

The Court recognizes the split of authority on this issue.  *Compare U.S. ex rel. Souza v. Am. Access Care Miami, LLC,* Case No. 11-22686-CIV-Lenard, slip op. (D.E. 53) (extending *Sequoia Orange* to judicial review of settlement in a qui tam action and citing three other unpublished district court cases that have done so), *with U.S. ex rel. Schweizer v. Oce N. Am.*, 956 F. Supp. 2d 1, 10–11 (D.D.C. 2013) *and U.S. ex rel. Nudelman v. Int'l Rehab. Associates, Inc.*, 00–cv–1837, 2004 WL 1091032, at *1 n. 1 (E.D.Pa. May 14, 2004) (finding, as a matter of first impression, that since Congress borrowed the key language of § 3730(c)(2)(B) from the rule governing judicial review of class action settlements, courts evaluating proposed FCA settlements should apply the same factors used in evaluating proposed class action settlements).

After reviewing the relevant legal principles and applicable case law, the Court finds the *Sequoia Orange* standard more appropriate for reviewing a qui tam settlement under § 3730(c)(2)(B).  In *Sequoia Orange*, the Ninth Circuit panel discussed the purpose of the FCA, as it was amended in 1986.  151 F.3d at 1144.  Before 1986, if the government elected to intervene in a qui tam action, the suit was conducted solely by the government.  *Id.*  The 1986 amendments increased a relator's role in the action but

4

maintained that the government has "primary responsibility" for the case, with supervisory powers over the relator.  *See* 31 U.S.C. § 3730(c)(1).  Among other things, the FCA allows the government to limit the relator's witnesses and the length of their testimony; stay the relator's discovery requests; and outright dismiss an action as long as the relators are afforded notice and a hearing.  31 U.S.C. § 3730(c)(2), (4).  The *Sequoia Orange* panel explained that the 1986 Amendments "actually increased, rather than decreased, executive control over qui tam lawsuits."  151 F.3d at 1144; *see Ridenour*, 397 F.3d at 931 ("Through the 1986 amendments, Congress granted the Government additional opportunities to intervene and increased its power to control qui tam actions."); *United States ex rel. Stillwell v. Hughes Helicopters*, Inc., 714 F.Supp. 1084, 1090 (C.D. Cal. 1989) ("The 1986 version of the False Claims Act continues the evolution of greater executive control over qui tam lawsuits."); s*ee also United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 724 (9th Cir.1994) ("The Court will not assume that the qui tam provisions of the False Claims Act were intended to curtail the prosecutorial discretion of the Attorney General.").  The panel added that the congressional intent behind the FCA was to "create only a limited check on prosecutorial discretion to ensure suits are not dropped without legitimate governmental purpose."  151 F.3d at 1145.  Ultimately, the *Sequoia Orange* panel held that the government may dismiss a qui tam suit, even a meritorious one, as long as the government shows a valid purpose that is rationally related to the dismissal.  *Id.*   The Tenth Circuit has readily adopted this standard, even allowing the government to dismiss a qui tam action without prior intervention.  *Ridenour*, 397 F.3d at 934–35.

This Court sees no reason why the government should be given such broad discretion to dismiss a case but not to settle it under circumstances that it deems fair, adequate, and reasonable.  *See Oce N. Am., Inc.*, 956 F. Supp. 2d at 1 (a fairness hearing regarding a qui tam settlement serves a "limited purpose of forcing the government to provide some reasoning behind its decision to settle a case. . . ."). Indeed, to significantly hamper the government's ability to settle may run afoul of the separation of powers doctrine.  *See Sequoia*, 151 F.3d at 1145–46 (stating that a rational relation test avoids any separation of powers concerns).  To condition the Government's right to settle an action—over which it has been granted "primary responsibility" by statute, *see* 31 U.S.C. § 3730(c)(1)—on a standard guided by such vigilant judicial scrutiny as required when reviewing a Rule 23 class action settlement would place the FCA on constitutionally unsteady ground.  Because the Court is to interpret statutes in a manner that renders them constitutionally valid, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001), the Court should avoid an interpretation that unnecessarily binds the government.  *See Ridenour*, 397 F.3d at 934 (stating the same with regard to dismissals of qui tam actions).

Moreover, the high degree of vigilance that is required when scrutinizing Rule 23 class action settlements is arguably less necessary in this context.  That scrutiny is meant "to protect the rights of the many absent class members who were not involved in the negotiations leading to settlements."  *In re Corrugated Contained Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir. 1981).  Here, however, the Government, not absent class members, is the real party in interest, and "[t]he [c]ourt need not protect the [g]overnment from itself by closely scrutinizing settlements it negotiates at an arm's

length with the [d]efendant." *Souza*, Case No. 11-22686-CIV-Lenard, slip op.  As the

Tenth Circuit has made clear, relators' objections to "proposed settlements between the

government and defendant should not pose a significant burden for the government or

courts." *Ridenour*, 397 F.3d at 931, n.10.

Accordingly, the Court reviews this qui tam action under the deferential *Sequoia*

*Orange* standard, looking to ensure that the Government has presented (1) a valid

purpose and (2) a rational relationship between settlement and the accomplishment of

that purpose.[2]

## III.  ANALYSIS

The Government's purpose for settling this dispute is based on its belief,

following a long and thorough investigation, that

(1)      many of the Relators' allegations are not likely meritorious and little to

no recovery would result after protracted and expensive litigation; and

(2)      those claims that are meritorious warrant punishing the Airport

Authority, but because the damages would be difficult, if not

impossible, to prove, settling for a penalty, rather than pursuing a

treble damages award, will best deter the Airport Authority and

preserve Government resources.

After reviewing the extensive documents in this case and thoroughly considering

the Government's justification and the Relators' objections, the Court finds that the

---

[2] Although the Court maintains that the *Sequoia Orange* standard is the more appropriate standard for approval of a settlement under 31 U.S.C. § 3730(c)(2)(B), the Court also finds that applying the Rule 23 factors would not change the outcome in this case.

Government's reason for settling is valid and rationally related to the ultimate settlement obtained. Nonetheless, the Court addresses the Relators' objections in turn.

**A.  <u>Wildlife Concern</u>**

The Relators contend that the settlement ignores the merits of their claim that the Airport Authority violated 31 U.S.C. § 3729(a)(1)(A) of the FCA when it falsely certified that it needed to erect the fence to control wildlife. Relators argue that the fence, which was erected only on the south side of the airport, does not prevent the incursion of wildlife and that the Airport Authority never actually intended it to do so. The Relators add that the Airport Authority's true desire was to construct a security fence, for which it would not have been provided funding. The Government did not find this contention to be actionable, in part because (1) the Airport Authority initially expressed concern for wildlife control *and* security, (2) the presence of wildlife at the airport was well-documented in a Wildlife Hazard Assessment conducted by the United States Department of Agriculture (USDA), and (3) the Airport Authority legitimately relied on the USDA Wildlife Hazard Assessment.

In support, the Government presented the Airport Authority's initial application for funding, which states that the fence was needed to "potentially decrease the amount of mammalian wildlife entering and residing on airport property" and to "improve the safety and security of air operations at the airport." (Doc. 1-2 at 8.) At the fairness hearing, FAA representative John Bauer testified that the following language accurately represented the Airport Authority's need for the fence:

> PURPOSE: The purpose of the proposed project is to construct 45,000 linear feet of perimeter fence to reduce the potential of wildlife and aircraft incursions, and help prevent

8

> and detect unauthorized entry of individuals into the Air
> Operations Area of the Airport.
>
> NEED: A Wildlife Hazard Assessment . . . recommended the
> installation of chain link fence to deter the mammalian
> population from entering and residing on airport property. . . .
>
> The proposed project would [also] allow for the airport to
> control and monitor access to the airport which would
> increase overall security and safety of the airport.

(Doc. # 40-1.)  Mr. Bauer added that both wildlife and security concerns are eligible for

funding under the FAA.

Moreover, Section 6.11 of the Wildlife Hazard Assessment recommended to the

Airport Authority that it erect a fence because:

> Due to [their] adaptable behavior, it is nearly impossible to
> permanently disperse resident fox or coyote from the entire
> airfield using only habitat modification or hazing procedures.
> A chainlink skirting attached to the bottom of the entire
> perimeter fence ran at a 45 degree angle on the outside,
> then covered with soil; along with a 10 foot "no-climb" 1-inch
> chain-link fence with 3-strand barbed-wire risers on the top
> would be the best long term solution.[3]

(Doc. # 60-2 at 38.)  The Airport Authority's Wildlife Management Plan reiterates this

wildlife concern and discusses its need for funding on that basis.  (Exhibit 15 at 8.)

Moreover, at the fairness hearing, Joe O'Haver of the Inspector General's Office, who

oversaw the investigation into the Relator's claims, testified that, based on his review of

all the evidence in this case, the Airport Authority's concern about wildlife was well-

supported.  Mr. O'Haver expressed some initial concern about why the fence, as built,

---

[3] At the fairness hearing the Relators expressed concern that the section of the Wildlife Hazard Assessment entitled "7.0 Recommendations" did not specifically recommend a wildlife fence. (Doc. # 60-2 at 19).  The absence of the recommendation under Section 7.0, however, does not change that fact that the fence was specifically recommended in Section 6.11. (*Id.* at 38.)

did not cover the north side of the airport—a side clearly open to wildlife incursion—but

explained that his concerns were assuaged when the FAA informed him that

> the north boundary was in [the] process of being moved as
> part of a . . . runway relocation project. . . . [so while the
> Airport Authority] could have completed the fence it would
> have cost considerable amount of money to tear that down
> and move it again once that project got under way.

Ultimately, Mr. O'Haver was satisfied that the Airport Authority had not knowingly

defrauded the FAA with respect to its concerns about wildlife at the airport.

Based on this Court's review of the parties' written submissions and oral

presentations at the fairness hearing, the Court finds the Government was justified in its

decision not to pursue the Relators' contention that the Airport Authority falsely

contrived the need for a wildlife fence.  The Relators' contrary objections do not

undermine the reasonableness, adequacy, or fairness of the proposed settlement in this

case.  *See Oce N. Am.*, 956 F. Supp. 2d at 11 (emphasizing that a fairness hearing is

not a hearing on the merits of the relators' claims).

B. **Socio-Economic Misrepresentations and Damages**

The Relators' next objection relates to their claim that the Airport Authority falsely

certified to the FAA in its Categorical Exclusion Forms (CatEx Forms) that it met all the

criteria imposed by the National Environment Policy Act (NEPA), thereby avoiding

mandatory environmental impact study requirements.  The Government agrees that the

Airport Authority violated the FCA when it initially reported that the fence would have no

socio-economic impact on businesses at the airport.

The Relators argue that this misrepresentation should result in a substantial

financial penalty that includes treble damages under the FCA.  *See* 31 U.S.C. §

10

3729(a)(1)(A) (setting forth a statutory penalty of $5,500 to $11,000, plus treble damages consisting of 3 times the amount of damage sustained because of fraudulent behavior); *see also* 28 CFR § 85.3(a)(9).   Relators specifically believe the damages award should be at least $16,500,000 ($5,000,000 in costs to the United States government for constructing the fence, multiplied by 3, plus interest and costs).

The Government, however, negotiated with the Airport Authority for a penalty-only settlement totaling $16,500 (approximately $5,500 for each false Cat-Ex form). The Government justifies this decision based on concerns that damages would be difficult, if not impossible, to prove because the FAA conceded that a timely disclosure of the socio-economic impact on businesses would not have changed whether the FAA approved the fence project.

The Court finds that the Government's reasoning is valid and the settlement penalty is fair, adequate, and reasonable under the circumstances.  Although a number of businesses were significantly impacted by the fence, the Court cannot overlook the clear testimony of FAA representative John Bauer.  He explained that, although the Airport Authority falsely certified its compliance with NEPA in its initial Cat-Ex form, the Airport Authority eventually revealed, in detail, the appropriate socio-economic impacts in a subsequent Cat-Ex form.  Once the FAA became aware of the socio-economic impacts, it still approved the fence project.[4]  Indeed, Mr. Bauer testified that, had the

---

[4] The Court is not persuaded by the Relators' contention that the FAA's approval was based on the fact that the fence project was well underway by the time the socio-economic impacts were revealed.  To the contrary, Mr. Bauer testified that the progress of the fence did not impact his decision to approve the project.

socio-economic impacts "been submitted in Cat-Ex No. 1," the FAA still "would have approved [the project]."

**C.  The Claw-Back Request**

The Relators also contend that the settlement is inadequate because it does not take into account the FAA's request for a refund from the Airport Authority for the costs of the electrification of a three-strand wire topper on the fence (termed the "claw-back request" by the parties).  That refund request totaled $520,450.83.  (Doc. # 42-2.)  The Government argues that it did not consider the claw-back request pertinent to the lawsuit or the settlement because it was not the result of fraud by the Airport Authority, but rather an oversight by the FAA.

Testimony from the fairness hearing supports the Government's position.  Mr. O'Haver testified that, after speaking with the FAA, he concluded that the refund for electrification of the wire topper was not relevant to the fraud investigation.  Rather, the initial FAA decision to provide funds for electrification was "an oversight on the FAA's part[;] . . . they had inadvertently allowed [it]."  Moreover, Mr. Bauer from the FAA testified that "[t]here was no misrepresentation" from the Airport Authority about the topper.  Indeed, the Airport Authority's submissions merely represented the topper as an alternate option.

Thus, the Court cannot conclude that it was unreasonable or unjustified for the Government to exclude consideration of the claw-back request from the settlement.  Indeed, this case is about fraud by the Airport Authority, and testimony at the fairness hearing, supported by other exhibits in the record, sufficiently indicate that there was no such fraud in relation to electrification of the wire topper.

### D. Arm's Length Negotiations

Finally, the Relators express concern that the Government's close relationship with the FAA and significant bargaining power over the Airport Authority undermines the legitimacy of the Government's investigation and settlement.  In essence, the Relators believe that settlement negotiations were not arms-length.

In assessing whether a settlement was fairly negotiated, courts often consider whether the settlement is the product of arm's length negotiations or whether it results from fraud, overreaching, or collusion.  *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 283 (D. Colo. 1997).

Here, the Relators have presented no evidence that the relationships between the FAA, Government, and Airport Authority resulted in fraud, overreaching, collusion, or lack of a thorough investigation into the Relators' allegations.  Indeed, if they had, the logical outcome would be a settlement that unfairly disadvantages the Airport Authority and creates a questionably large award for the Government, which is not the case here. Moreover, the Court finds that the Government conducted an extensive investigation into this matter that reveals no signs of fraud, overreaching, collusion.  At the fairness hearing, Mr. O'Haver testified that, among other things, he reviewed all the documents related to the case, interviewed witnesses, spoke with the Relators, met with FAA and airport personnel, and ultimately conducted a very "thorough investigation."  The Government maintains that it reviewed thousands of documents and interviewed dozens of witnesses before reaching its ultimate decision to settle the case.

The Court finds that this settlement is the product of arm's length negotiations.

13

## IV.   <u>CONCLUSION</u>

The Court commends the Relators for their intervention in this case.  It is clear that they spent a significant amount of time and energy on this matter which resulted in a positive change in the management of the airport.  Without their diligent efforts, this matter would not have been brought to the Government's or the Court's attention.

Nonetheless, having fully considered the parties' written and oral presentations, as well as the voluminous exhibits in the record and the applicable legal authority, the Court finds that the Government has met its burden of showing that the settlement is fair, adequate, and reasonable in all circumstances pursuant to 37 U.S.C. § 3730 (c)(2)(B).

Accordingly, the Government's Motion for Order to Approve Settlement Notwithstanding Relators' Objection (Doc. # 32) is GRANTED and the Settlement Agreement (Doc. # 32-1) is APPROVED.

DATED:  February 27, 2017                    BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge